UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

| | | |
|---|---|---|
| JOHN CORDELL, | ) | |
| | ) | |
| Plaintiff, | ) | 1:21-CV-00315-DCLC-CHS |
| | ) | |
| v. | ) | |
| | ) | |
| HAMILTON COUNTY TENNESSEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Motion for Summary Judgment [Doc. 55] filed by Defendants Hamilton County, Tennessee, and John Does 1, 2, and 3 (collectively, "Defendants"). Plaintiff John Cordell filed a Response in Opposition [Doc. 58]. And Defendants filed a Reply [Doc. 61]. The Motion is now ripe for adjudication. For the reasons explained below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

I.      **FACTUAL BACKGROUND**

On January 17, 2021, Joseph Mefford, accompanied by Cordell in the passenger seat, led members of the Hamilton County Sheriff's Office ("HCSO") and other law enforcement agencies in a high-speed pursuit [Doc. 1, ¶¶ 5.1-5.2; Doc. 59, pg. 34 ¶ 1]. During the pursuit, Cordell called 911 three times and informed the dispatcher he was not involved in the pursuit [Doc. 58-5, 95:10-95:15, 95:21-95:24, 99:1-99:3, 99:13-99:18; Doc. 59, pg. 34 ¶ 3]. Law enforcement eventually boxed in Mefford's car, ending the pursuit [*See* Doc. 59, pg. 34 ¶ 4].

Three law enforcement personnel approached the passenger side and encountered Cordell, who had his seatbelt buckled and hands raised [*See* Doc. 58-5, 41:2-41:5, 41:8-41:9; Doc. 59, pg.

34 ¶ 5]. The officers instructed Cordell both to exit and show his hands and not to move or reach [Doc. 59, pg. 35 ¶ 6]. Unable to comply with both sets of instructions, Cordell remained in the passenger seat with his hands raised [*See* Doc. 58-6, 41:11-41:17].

One of the officers unbuckled Cordell's seatbelt, and the others pulled Cordell from the car [Doc. 59, pg. 35 ¶ 9]. As they removed Cordell from the car, Defendant Deputy Sheriff Aaron Cameron (hereafter "Deputy Cameron") activated his taser on Cordell's arm, and continued to tase Cordell as he fell to the ground [Video File 11360_Armstrong_Road.mp4 (hereafter "Video"), 00:20-00:30].[1] The video shows Deputy Cameron tased Cordell an additional six times: (1) once when Cordell landed on the ground; (2-3) twice when Cordell rolled over on his back with his arms raised; (4-5) twice when Deputy Cameron commanded Cordell to roll over onto his stomach; and (6) once when Cordell rolled onto his left side [Video, 00:30-00:45]. Cordell ultimately rolled onto his stomach and, while held down by four officers, handcuffed [Video, 00:45-00:1:10]. Law enforcement personnel then raised Cordell up and placed him against a police cruiser and patted him down [Video, 1:10-1:50, 2:15-2:48]. While being patted down, Cordell stated that he called 911 multiple times [Video, 1:30-1:32, 1:54-1:55]. After the pat-down, Deputy Cameron instructed Cordell to sit down [Video, 2:48-2:50] and then forced Cordell to the ground [Video, 2:50-2:53; Doc. 59, pg. 36 ¶ 17].

Deputy Cameron thereafter executed an Affidavit of Complaint, accusing Cordell of "Resisting Arrest or Obstruction of Legal Process" [Doc. 58-7, pgs. 1-2]. Deputy Cameron asserted that Cordell refused to comply with commands to exit Mefford's car and, once forced out, offered resistance by: (1) "tensing his arms"; (2) "concealing his hands underneath his body"; and

---

[1] The Video, consisting of Deputy Cameron's body camera footage, can be found in a flash drive that was manually filed with the Court [Doc. 60].

2

(3) making "furtive movements by flailing his body and arms in various directions" [Doc. 58-7, pg. 3]. Deputy Cameron stated that this "resistance" necessitated the use of his taser to "gain compliance and to [e]ffect the arrest" [*Id.*]. Deputy Cameron stated that Cordell also refused to comply with commands after being handcuffed [*Id.*]. And Deputy Cameron stated that although Cordell claimed to have told dispatch that he was not involved in the pursuit, Deputy Cameron was never apprised of that information [*Id.*]. The charge was later dismissed upon the state's motion [Doc. 58-8].

Deputy Cameron also prepared a Resistance Report, in which he gave a slightly different description of Cordell's resistance:

> Cordell, while giving the appearance of complying by raising his hands, refused to obey verbal commands to exit the vehicle. Cordell had to be forcibly removed from the vehicle and once out, continued to offer resistance to being taken into custody by tensing his arms and body and making furtive movements, at times, concealing his hands underneath his body. Cordell retained control of his arms hidden underneath his body. Officers feared Cordell was concealing a weapon . . . . I conducted a drive stun with my Taser . . . in an attempt to gain compliance and to [e]ffect the arrest of Cordell. Cordell made erratic movements during which and as a result contact with my taser was lost and regained several times. . . . Once in custody Cordell continued to refuse to comply with commands and had to be forcibly taken to the ground, via leg sweep, into a seated position. . . . Cordell will be charged with resisting stop, frisk, halt for his actions.

[Doc. 58-16, pg. 2].

Sheriff's Sergeant Eric Baxter (hereafter "Sergeant Baxter") reviewed Deputy Cameron's report and body camera footage and determined that "Deputy Cameron followed policy and procedure during the pursuit and arrest. I approve his actions" [Doc. 58-16, pg. 9]. The Resistance Report was then forwarded to Sheriff's Lieutenant Henry Ritter, who, in turn, forwarded the report to HCSO's Internal Affairs Division (hereafter "Internal Affairs") [*Id.*]. The next day, Cordell filed a complaint of excessive force with Internal Affairs [Doc. 56-16, ¶ 12; Doc. 59, pg. 36 ¶ 22]. Cordell asserted that over the course of the incident, he was tased several times, struck twice with

3

a police baton, punched three times, and kicked four times by the arresting officers [Doc. 56-17, pgs. 1-2].

Internal Affairs investigated Cordell's allegations and, after Cordell filed the Complaint, issued two reports with its findings [Docs. 56-17, 58-9]. During the investigation, Deputy Cameron asserted that he tased Cordell because Cordell failed to comply with commands to exit Mefford's car and, while on the ground, to place his hands behind his back [Doc. 58-9, pg. 8]. Deputy Cameron stated that he forced Cordell to the ground after the pat-down search because he felt Cordell "pull away" in the opposite direction he wanted Cordell to go [*Id.*]. Internal Affairs concluded that Deputy Cameron violated HCSO's excessive use of force policy [Doc. 56-17, pg. 7; Doc. 58-9, pg. 9]. Internal Affairs also confirmed that Cordell contacted the Rhea County, Tennessee, 911 center, but the information he provided was not relayed to Hamilton County 911 [Doc. 58-9, pg. 9]. Sheriff Jim Hammond concurred with Internal Affairs and ordered that Deputy Cameron be disciplined with a 24-hour suspension and eight hours of remedial training [Doc. 56-20].

## II. PROCEDURAL HISTORY

Based on the above facts, Cordell initiated this action against Hamilton County, Deputy Cameron, and John Does 1, 2, and 3 [Doc. 1; Doc. 31].[2] Cordell claims that Deputy Cameron and the John Does are liable under 42 U.S.C. § 1983 and Tennessee law for excessive use of force, false arrest, and malicious prosecution [Doc. 31, ¶¶ 6.1-7.8, 10.1-10.5]. Cordell contends that Hamilton County is derivatively liable under 42 U.S.C. § 1983 because it "lacked adequate customs, policies, procedures, supervision, investigation, and training of its employees to prevent

---

[2] Cordell also sued Rhea County and Deputy Sheriffs Chris Rice and Alexandria Paul [Doc. 31]. Cordell's claims against them were dismissed by stipulation of the parties [Docs. 47, 51].

4

individuals, including Mr. Cordell, from being arrested without probable cause and to prevent its officers from using excessive force" [Doc. 31, ¶ 8.2]. And he asserts that Hamilton County is vicariously liable under Tenn. Code. Ann. § 8-8-301 et seq. [Doc. 31, ¶¶ 9.1-9.3].

Defendants now move for summary judgment on Cordell's claims against Hamilton County and the John Does [Doc. 55], supported by a Statement of Material Facts [Doc. 56] and Memorandum [Doc. 57]. Cordell filed Responses to both Defendants' Motion and Statement of Material Facts [Docs. 58, 59], including an objection to Defendants' reliance on previously undisclosed evidence [Doc. 59, pgs. 1-3]. Defendants filed a Reply [Doc. 61].

## III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The movant can discharge his burden by either affirmatively producing evidence establishing that there is no genuine dispute of material fact or pointing out the absence of support in the record for the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has discharged this burden, the nonmoving party can no longer rest on the allegations in the pleadings and must point to specific facts supported by evidence in the record demonstrating that there is a genuine issue for trial. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The Court's role is to determine whether, viewing the facts and drawing all inferences therefrom in the light most favorable to the nonmovant, a reasonable juror could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255-56 (1986).

## IV. ANALYSIS

### A. Evidentiary Issues

Cordell objects to Defendants' reliance on the Declaration of Miriam Laracuente and a 2020 assessment from the Commission on Accreditation for Law Enforcement Agencies ("CALEA") on HCSO's compliance with CALEA standards because they were not disclosed during discovery [Doc. 59, pg. 1-3; *see* Docs. 56-1, 56-2]. In her Declaration, Laracuente states that she is the "Professional Standards and Accreditation Manager" for HCSO [Doc. 56-1, ¶ 2]. Laracuente asserts that HCSO has been accredited since 2013 by CALEA, which she describes as the "highest possible accreditation in the law enforcement community" [*Id.*, ¶¶ 4-5, 15]. To be accredited, Laracuente states that law enforcement agencies must implement and follow standards promulgated by CALEA, satisfy national standards, and review and update policies based on new court rulings [*Id.*, ¶ 5, 17]. Laracuente states that CALEA conducts compliance assessments every four years, with sub-assessments conducted over the course of the four-year period [*Id.*, ¶ 19]. Laracuente contends that CALEA completed its four-year assessment of HCSO in 2020, concluding that that HCSO satisfied CALEA's standards for, among other areas, use of force, use of less than lethal weapons, supervisory accountability, training, and compliance with constitutional requirements [*Id.*, ¶¶ 20, 22-30, 35]. Laracuente's Declaration also quotes excerpts of CALEA's 2020 assessment regarding the form of HCSO's training, HCSO's Internal Affairs, and HCSO's policy regarding motor vehicle pursuits [*Id.*, ¶¶ 33, 36, 40-41]. Attached to Laracuente's Declaration is CALEA's 2020 assessment of HCSO [*Id.*, ¶ 20; *see* Doc. 56-2]. Cordell also objects to Defendants' reliance on the Declaration of Captain Spencer Daniels because it is incomplete [Doc. 59, pg. 2; *see* Doc. 56-3]. Defendants did not address Cordell's objections in their Reply [*See generally* Doc. 61].

6

Case 1:21-cv-00315-DCLC-CHS   Document 82   Filed 10/04/23   Page 6 of 19   PageID #: 1205

Cordell's objections are well-taken. The Court's Scheduling Order set April 19, 2023, as the deadline for Defendants to disclose expert testimony and May 19, 2023, as the deadline for all discovery [Doc. 20, ¶¶ 4.e.-4.f.]. Cordell's uncontested allegation establishes that Defendants violated the Scheduling Order and their obligation under the Federal Rules of Civil Procedure to supplement discovery production. *See* Fed.R.Civ.P. 26(a)(1)(A)(i)-(ii), 26(a)(2)(D)(ii), 26(e). The Court cautioned that failure to comply with the Scheduling Order's requirements "will result in the exclusion of witnesses [and] exhibits" [Doc. 20, ¶ 9]. The Rules likewise require exclusion "unless the failure . . . was substantially justified or . . . harmless," which Defendants have failed to establish. Fed.R.Civ.P. 37(c)(1); *see Roberts v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (stating that the party to be sanctioned carries burden under Rule 37(c)(1)). Cordell's objection to Laracuente's Declaration and CALEA accreditation materials is therefore **SUSTAINED** and the Court will not consider the declaration in ruling on the motion for summary judgment.

Review of Captain Daniels's purported declaration confirms that it is incomplete. It consists of ten paragraphs numbered "40" through "49" and Captain Daniels's signature [Doc. 56-3]. However, there is no declaration that the statements asserted therein were made under penalty of perjury. 28 U.S.C. § 1746. Thus, the Court cannot consider it. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 766 n.1 (6th Cir. 2018). Cordell's objection to Captain Daniels's declaration is therefore **SUSTAINED** and the Court will not consider this declaration in ruling on the motion for summary judgment.

The Court separately notes that the Declaration of Lieutenant Robert D. Lee is unsigned [Doc. 56-16, pg. 4]. Lieutenant Lee's Declaration is therefore not competent summary judgment

evidence and forms no part of this Memorandum Opinion and Order, except to the extent the facts asserted therein are undisputed for purposes of summary judgment.

B.     **John Doe Defendants**

Defendants move for summary dismissal of the John Doe defendants because they have not been named and the time to do so has passed [Doc. 57, pgs. 1-2, 6-7]. Cordell does not object to Defendants' request, indicating that he would have agreed to stipulate to the John Does' dismissal [Doc. 58, pg. 15]. Defendants' Motion is therefore **GRANTED IN PART** with respect to the John Doe defendants.

C.     **Liability under 42 U.S.C. § 1983**

Cordell seeks to hold Hamilton County liable under 42 U.S.C. § 1983 for Deputy Cameron's alleged false arrest for resisting arrest and excessive use of force in effectuating the arrest. Defendants move for summary judgment on this claim, asserting that Cordell cannot present evidence to support any of his theories of § 1983 liability. First, Defendants argue that Cordell's pleadings failed to identify the policies he contends are illegal and that the record does not establish a custom of arrests unsupported by probable cause or improper taser use [Doc. 57, pgs. 11-14]. Second, Defendants argue that there is no evidence of a deficiency in HCSO training about use of force, use of a taser, or determining probable cause [Doc. 57, pgs. 16-17]. And third, Defendants argue that there is no evidence that HCSO failed to respond to repeated complaints of deputy misconduct, investigate deputy misconduct, or discipline deputies for their misdeeds [Doc. 57, pgs. 17-20].

Cordell responds that Hamilton County's written policies are unconstitutional as written because: (1) they do not mention a requirement of probable cause, define probable cause, or require that a deputy consider exculpatory evidence [Doc. 58, pgs. 17, 19-21]; and (2) Hamilton County's

8

use of force policies do not include a use of force continuum, fail to provide definitions to direct officer discretion on the amount of force to use, and include mere "pulling away" as an example of active resistance [Doc. 58, pgs. 17-20]. Cordell argues that HCSO impermissibly instructs deputies to use "whatever force is necessary," fails to distinguish between volitional acts and movements caused by a deputy, and fails to provide instruction on whether to consider exculpatory evidence [Doc. 58, pgs. 21-22]. And Cordell argues that Sergeant Baxter's approval of Deputy Cameron's conduct, delays in the investigation into Deputy Cameron's conduct, and the lack of an investigation into other law enforcement personnel involved in Cordell's arrest establish a failure to supervise and investigate [Doc. 58, pgs. 23-24].

Defendants reply that there is no evidence that Hamilton County was on notice of any deficiency in its policies, without which Cordell cannot succeed on an official-policy theory [Doc. 61, pgs. 3-4]. Defendants further reply that there is no evidence that Sheriff Hammond deliberately elected to pursue a course of action relative to training that would constitute deliberate indifference [Doc. 61, pgs. 6-9]. And Defendants argue that alleged deficiencies in an investigation after the constitutional injury occurred are not enough to sustain a failure to investigate claim [Doc. 61, pg. 8].

Section 1983 of Title 42 creates a private cause of action for violations of constitutional rights. Liability under § 1983 extends to local government entities when the predicate unconstitutional act "occurred because of a municipal policy or custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). This can be established in one of four ways:

(1) the existence of an illegal official policy or legislative enactment;

(2) that an official with final decision making authority ratified illegal actions;

(3) the existence of a policy of inadequate training or supervision; or

(4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Id.* (paragraph breaks added). Here, Cordell seeks to establish liability on all but the last theory [Doc. 1, ¶ 8.2]. Each theory is addressed in turn.

### 1. Official Policy

The first theory of municipal liability under § 1983 requires the plaintiff to establish that an identified policy is either "facially unconstitutional as written or articulated" or "facially constitutional but consistently implemented to result in constitutional violations." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "An official written policy is itself unconstitutional only if it affirmatively allows or compels unconstitutional conduct." *Edwards v. City of Balch Springs*, 70 F.4th 302, 309 (5th Cir. 2023) (internal quotation marks omitted); *accord Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012); *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 392 (8th Cir. 2007). Otherwise, the plaintiff "'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequence.'" *Gregory*, 444 F.3d at 752 (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 407, 137 (1997)).

Cordell claims Hamilton County's policies addressing probable cause do not expressly require probable cause to exist for an officer to make an arrest. He further claims the policies do not define probable cause and do not require an officer to consider exculpatory evidence in making that determination. Hamilton County's policy explicitly defers to "the requirements of federal, state, and local law," in reference to making probable cause determinations [Doc. 58-11, ¶ 1]. And federal law requires officers to have probable cause to effect an arrest. Thus, contrary to Cordell's

argument, Hamilton County's policy does require probable cause to effect an arrest. This issue is without merit.

Cordell also challenges Hamilton County's use of force policies because they give the arresting deputy discretion with improper guidance on what constitutes active resistance that would justify use of a taser. However, the policies as written do not authorize or compel the excessive use of force. Hamilton County's policies authorize only what force "a reasonable deputy would deem necessary" after considering the totality of the circumstances [Doc. 56-9, ¶ A; *see also id.*, ¶ C.1.]. That policy requires the officer to use only "the minimal amount of force reasonably necessary" [Doc. 56-18, ¶ 1.K.]. Hamilton County's policies also *prohibit* the use of a taser: (1) on a suspect who "no longer poses a threat, has complied with the deputies instructions, loses the ability to escape, or any other time that the use would be inconsistent with current training" [Doc. 56-10, ¶ III.B.3.]; (2) "to gain compliance over subjects who the deputy reasonably believes [are] not presenting an immediate, credible threat to the safety of the deputy(s), the public or to themselves" [*Id.*, ¶ III.B.8.]; or (3) "[p]unitively or for purposes of coercion (where no threat exists)" [*Id.*, ¶ III.B.10.]. And the policies discourage the use of a taser "[w]hen a prisoner is handcuffed, unless combative and uncooperative or poses a threat to the deputy, themselves or others" [*Id.*, ¶ III.B.11.h.].

Although Hamilton County's policies list "pulling away" among examples of active resistance in response to which a taser may be used [*Id.*, ¶ III.B.3], they nevertheless must be read in conjunction with the repeated emphasis on what is objectively reasonable under the circumstances. And pulling away can, in the presence of other circumstances, constitute active resistance. *See Bell v. City of Southfield*, 37 F.4th 362, 368 (6th Cir. 2022); *Goodwin v. City of*

11

*Painesville*, 781 F.3d 314, 326 (6th Cir. 2015). Cordell cannot therefore establish municipal liability based on the text of Hamilton County's policies.

### 2. Ratification

Cordell also seeks to hold Hamilton County liable under § 1983 on a theory that they ratified Deputy Cameron's conduct. The Supreme Court "has rejected *respondeat superior* theories that subject employers like [HCSO] to liability for their employees' actions." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 494 (6th Cir. 2020) (citing *Brown*, 520 U.S. at 403). "Because municipal liability requires an unconstitutional 'policy' or 'custom,' [the Sixth Circuit has] held that an allegation of a *single* failure to investigate a single plaintiff's claim does not suffice." *Id.* at 495 (emphasis in original). Liability can attach only if there "is an inadequate investigation in this instance [and] a clear and persistent pattern of violations in earlier instances." *Id.* (internal quotation marks omitted).

Here, Cordell points to Sergeant Baxter's approval of Deputy Cameron's conduct, the delays in investigating his complaint, and the lack of an investigation into the other officers who participated in his arrest. Cordell has presented no evidence of a "clear and persistent pattern of violations in earlier instances." *Id.* The most he alleges is a failure to conduct an adequate investigate here. But an inadequate investigation in a single instance is not enough. *Id.* And the fact that Sergeant Baxter approved of Deputy Cameron's conduct is also not sufficient because that approval did not cause Cordell's injury. *See id.* at 496 (supervisor's after-the-fact approval of the investigation did not cause Pineda's injury") (internal quotation marks and citations omitted). Thus, he cannot succeed on a ratification theory.

### 3. Failure to Supervise

To state a § 1983 claim for failure to supervise, Cordell must show: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). To show the municipality was "deliberately indifferent," Cordell must further show either "prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury," *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005), *or* "a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation," *Brown*, 520 U.S. at 409.

As Hamilton County observes, Cordell's Amended Complaint does not specify what is wrong about HCSO's supervision of Deputy Cameron individually or of its deputies generally [*See generally* Doc. 31]. Cordell's Response does not clarify the basis for liability under this theory as distinguished from his ratification theory [*See* Doc. 58, pgs. 22-24]. To the extent Cordell relies on Sergeant Baxter's after-the-fact approval of Deputy Cameron's conduct, that is not enough. *See Ward v. County of Cuyahoga*, 721 F. Supp. 2d 677, 693 (N.D. Ohio 2010) ([A]n after-the-fact report has no bearing on whether the County was deliberately indifferent to an obvious need to provide adequate . . . supervision prior to the incident."). Liability for inadequate supervision requires (1) that a flaw in Deputy Cameron's supervision be the "moving force" behind his use of excessive force and false arrest and (2) that Hamilton County was deliberately indifferent to the

13

"known or obvious" constitutional violations that would result from that flaw. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 408 (6th Cir. 2022) (internal quotation marks omitted).

There is no evidence in the record of a pattern of past complaints about Deputy Cameron specifically or HCSO deputies generally from which a reasonable juror could find that Hamilton County was deliberately indifferent to inadequate supervision of HCSO personnel. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018). And Cordell failed to otherwise identify a flaw in supervision which led to Deputy Cameron's use of force or unlawful arrest. *See Ellis ex rel. Pendergrass*, 455 F.3d at 700. Therefore, Cordell cannot succeed on a failure-to-supervise theory.

**4.    Failure to Train**

**i.    Probable Cause**

Cordell claims HCSO failed to properly train its officers in making probable cause determinations. Liability on this theory requires either: (1) a pattern of constitutional violations; or (2) a single constitutional violation, "accompanied by a showing that [Hamilton County] has failed to train its employees to handle recurring situations presenting an obvious potential for such violation." *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (internal quotation marks omitted). Cordell explicitly disclaims reliance on the former [Doc. 58, pg. 22], so he must present evidence that shows "a complete failure to train the police force, or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal citations omitted).

The parties agree that HCSO trains its officers about probable cause and that Deputy Cameron received probable cause training [Doc. 56, ¶¶ 60-62, 81; Doc. 59, pgs. 23-24, 27; *see also* Doc. 56-4, ¶¶ 18-19, 45; Doc. 58-2, 48:4-48:21]. Captain Daniels's deposition testimony and

14

Sergeant Durham's declaration provide that probable cause training is covered every other year as part of "strategies and tactics of patrol stops" training, including that officers are to consider all the facts available without assuming probable cause exits [Doc. 56-4, ¶¶ 18-20; Doc. 58-2, 48:4-48:21, 49:1-49:4; Doc. 58-3, 70:3-70:8]. Cordell has not shown that the training the municipality provides its officers is deficient regarding probable cause determinations or consideration of exculpatory evidence in making those judgments. *See Zavatson v. City of Warren*, 714 F. App'x 512, 527 (6th Cir. 2017).

### ii. Use of Force

Cordell also claims HCSO failed to properly train on use of force. As with probable cause, the parties agree that HCSO trains its deputies on the use of force and that Deputy Cameron received use of force training [Doc. 56, ¶¶ 49, 64-74, 81; Doc. 59, pgs. 21, 24-27; *see also* Doc. 56-4, ¶¶ 4, 22-33, 45; Doc. 56-13, pgs. 5, 7; Doc. 56-14, pgs. 6, 13-15, 29, 33, 36-41; Doc. 58-2, 31:9-34:19]. Cordell asserts that there are two flaws in the substance of that training: (1) it instructs deputies to use "whatever force" is necessary; and (2) it fails to train deputies to distinguish between levels of resistance [Doc. 58, pg. 22].

The first asserted flaw is based on Sergeant Durham's deposition testimony that HCSO trains its deputies to use "whatever force is necessary to effect control" [Doc. 58, pg. 21]. But that's not all Sergeant Durham said. Sergeant Durham also said that need for force follows from whether the individual is a threat [*See* Doc. 58-4, 40:3-40:9]. And Sergeant Durham testified about the kinds of resistance that would allow for the use of a taser [Doc. 58-4, 31:3-31:18]. Moreover, Lieutenant Lee testified that "whatever amount of force would not be reasonable" and that "the necessary amount and the least amount would be the same" [Doc. 58-4, 20:3-20:4, 20:6-20:8].

15

Together, the evidence of HCSO's training does not lead to the inference that it trained its officers to use any amount of force the officer saw fit.

The second flaw is based on Sergeant Durham's purported deposition testimony that deputies are trained to view mere pulling away as active resistance that would justify the use of a taser [Doc. 58, pg. 21]. But that is not what Sergeant Durham said, he testified that he taught the difference between active and passive resistance and prohibited the use of a taser for passive resistance [Doc. 58-4, 31:3-31:18, 40:12-40:18]. He also contrasted two examples to illustrate the difference: (1) refusing to comply with a command (passive resistance) [Doc. 58-4, 34:1-34:7]; and (2) "the guy that you go to put a hand on that jerks away *and* tries to run" [Doc. 58-4, 34:8-34:11 (emphasis added)], or verbal threats coupled with threats of physical aggression and movement toward the officer (active resistance) [Doc. 58-4, 31:9-31:14]. Both examples are consistent with Sixth Circuit precedent. *See Baker v. Union Twp.*, 587 F. App'x 229, 236 (6th Cir. 2014) ("Flight is a form of resisting arrest and flight alone has been held to warrant deployment of a taser[.]"); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) ("[N]oncompliance alone does not indicate active resistance; there must be something more[, including] a verbal showing of hostility [or] a deliberate act of defiance using one's own body[.] (Internal citations omitted)). Cordell has not otherwise submitted evidence on the substance of HCSO's training on the use of force. Cordell therefore failed to put forward sufficient evidence from which a reasonable juror could find that HCSO's training was so inadequate as to make it obvious that tasers would be deployed against nonresistant arrestees.

Because Cordell has failed to present sufficient evidence from which a reasonable trier of fact could find in his favor on his asserted grounds for why Hamilton County is liable under 42 U.S.C. § 1983, Defendants' Motion is **GRANTED** with respect to Cordell's § 1983 claims against

16

Hamilton County. The Court now turns to Cordell's state law claims under Tenn. Code Ann. § 8-8-302 against Hamilton County.

### D. Vicarious Liability under Tenn. Code Ann. § 8-8-302

Defendants also move for summary judgment on Cordell's state law claim for vicarious liability under Tenn. Code Ann. § 8-8-302. Defendants argue that Tennessee courts interpret Tenn. Code Ann. § 8-8-302 to require that the offending deputy misuse his office to facilitate a crime before the municipality can be held liable, to which Deputy Cameron's conduct does not arise [*See* Doc. 57, pgs. 21-24]. Cordell responds that none of the cases Defendants cite supports their position [*Id.*]. Defendants' Reply does not further address vicarious liability but limits its Motion to "summary judgment on the federal claims" [Doc. 61, pg. 9].

Section 8-8-302 provides:

> . . . Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code Ann. § 8-8-302. Section 8-8-303 waives sovereign immunity for counties for violations of § 8-8-302. Tenn. Code Ann. § 8-8-303(a). "In interpreting this statutory scheme, the Tennessee Supreme Court has held that it applies to non-negligent conduct of deputies and that these claims are generally not barred by [Tennessee's Governmental Tort Liability Act] immunity." *Merolla v. Wilson Cnty.*, No. M2018-00919-COA-R3-CV, 2019 WL 1934829, at *6 (Tenn. Ct. App. May 1, 2019) (citing *Jenkins v. Loudon Cnty.*, 736 S.W.2d 603, 609 (Tenn. 1987), *abrogated in part by Limbaugh v. Coffee Med. Ctr.*, 59 S.W.3d 73 (Tenn. 2001)). Where a plaintiff alleges intentional tort claims, the claim against the county under Tenn. Code Ann. § 8-8-302 will generally survive summary judgment to the same extent as the underlying tort claims. *See, e.g.*, *Pryor v. Coffee Cnty.*, No. 4:20-cv-00014, 2022 WL 131251, at *15 (E.D. Tenn. Jan. 12, 2022);

17

*Howe v. Howell*, No. 2:19-cv-00067, 2021 WL 1736822, at *12 (M.D. Tenn. May 3, 2021); *Simpson v. White Cnty.*, No. 2:13-cv-00087, 2016 WL 323732, at *7 (M.D. Tenn. Jan. 27, 2016); *Margeson v. White Cnty.*, Tenn., No. 2:12-00052, 2013 WL 6712843, at *11 (M.D. Tenn. Dec. 18, 2013).

Defendants claim that liability under Tenn. Code Ann. § 8-8-302 will attach only if Deputy Cameron's conduct was criminal [Doc. 57, pgs. 22-24]. But none of the cases Defendants cite makes criminal conduct the exclusive threshold for liability; rather, they concern when a deputy can be considered acting "by virtue of or under color of the office." *See Currie v. Haywood Cnty.*, No. W2010-00453-COA-R3CV, 2011 WL 826805, at *4 (Tenn. Ct. App. Mar. 10, 2011) (unreported) (citing Tenn. Code Ann. § 39-16-402 for the proposition that a deputy acts "by virtue of or under color of office" when he acts in his official capacity or takes advantage of his official capacity to facilitate a crime); *Doe v. Pedigo*, No. E200201311COAR3CV, 2003 WL 21516220, at *8-10 (Tenn. Ct. App. June 30, 2003) (unreported) (holding that a genuine dispute of fact existed as to whether a doctor acted in the capacity of a deputy sheriff when he administered a hepatitis B vaccine to a minor while awaiting calls to investigate crime scenes); *J.W. ex rel. Watts v. Maury Cnty.*, No. M2001-02768-COA-R3-CV, 2003 WL 1018138, at *7 (Tenn. Ct. App. Mar. 11, 2003) (unreported) (holding that a genuine dispute of fact existed as to whether a School Resource Officer acted by virtue of or under color of his office when the victim's mother contacted him, he persuaded the mother to let the victim sleep at his apartment, and he later assaulted the victim). Here, there is no dispute that Deputy Cameron was acting in his capacity as deputy sheriff at the time of the incident. And there is no dispute that Cordell's claims against Deputy Cameron are premised on non-negligent conduct. Defendants' Motion is therefore **DENIED** as to derivative liability under Tenn. Code Ann. § 8-8-302. *Cf. Klaver v. Hamilton Cnty.*, No. 1:19-cv-198, 2022

18

Case 1:21-cv-00315-DCLC-CHS   Document 82   Filed 10/04/23   Page 18 of 19   PageID #: 1217

WL 16731735, at *14 (E.D. Tenn. Feb. 2, 2022) (rejecting an identical argument by Hamilton County).

## V. CONCLUSION

For the reasons discussed above, Defendants' Motion for Summary Judgment [Doc. 55] is **GRANTED IN PART** and **DENIED IN PART**. Cordell's claims against the John Doe defendants are **DISMISSED**. Cordell's 42 U.S.C. § 1983 claim against Hamilton County is **DISMISSED**. And Cordell's surviving vicarious liability claim under Tenn. Code Ann. § 8-8-302 against Hamilton County will proceed.

**SO ORDERED:**

s/ Clifton L. Corker
United States District Judge